Appeal No. 2015-1587

# United States Court of Appeals

*for the*

# Federal Circuit

YAO-HUNG HUANG, BIG TIME AUTO PARTS MANUFACTURING, INC.,
a Taiwan corporation,

*Plaintiffs-Appellants,*

– v. –

MARKLYN GROUP, INC., a Canadian corporation, dba Alpena,

*Defendant-Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLORADO IN CASE NO. 1:11-CV-01765-REB-NYW
DISTRICT JUDGE ROBERT E. BLACKBURN

## BRIEF FOR PLAINTIFFS-APPELLANTS

AARON P. BRADFORD
HOLLAND & KNIGHT LLP
633 17th Street, Suite 2300
Denver, Colorado 80202
(303) 974-6600

*Attorneys for Plaintiffs-Appellants*

August 21, 2015

Form 9

FORM 9.   Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Big Time Auto Parts Manufacturing, Inc., Yao-Hung Huang  v.  Marklyn Group, Inc.

No. 15-1587

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Petitioner/Appellant _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

Big Time Auto Parts Manufacturing, Inc.
Yao-Hung Huang

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Big Time Auto Parts Manufacturing, Inc.
Yao-Hung Huang

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Holland & Knight.

May 6, 2015
Date

s/Aaron P. Bradford
Signature of counsel

Aaron P. Bradford
Printed name of counsel

Please Note: All questions must be answered
cc: James Jablonski

124

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................... iii

STATEMENT OF RELATED CASES ..................................................1

JURISDICTIONAL STATEMENT ........................................................2

STATEMENT OF THE ISSUES...........................................................3

INTRODUCTION ...............................................................................4

STATEMENT OF THE CASE..............................................................7

    A.    Big Time's Innovation .........................................................8

    B.    United States Design Patent 614,780 ...............................11

    C.    LEDLitz, Head 'N' Grill Litz and Motion LED Infringe
        D'780................................................................................12

    D.    Big Time brought suit to halt Marklyn's infringement.......15

    E.    Big Time's evidence of infringement goes unrebutted at trial ...........17

    F.    Marklyn had a number of design alternatives available
        rendering D'780 ornamental and non-functional................21

    G.    Jury Instruction Conferences and Instruction 11 on
        Infringement ....................................................................21

    H.    Anticipation and Jury Instruction 16..................................26

        1.    JOM and LED-Stripe ...............................................27

        2.    German Utility Model Patent filed by JOM ............27

        3.    Marklyn's testimony regarding the differences between
            the JOM reference and D'780....................................31

        4.    Similarities between JOM and '780 patent are
            functional ................................................................34

    I.    Verdict of Infringement, Non-Infringement and Anticipation ...........34

SUMMARY OF THE ARGUMENT ....................................................35

ARGUMENT ....................................................................................38

i

I.      STANDARD OF REVIEW APPLICABLE TO THE ISSUES
        PRESENTED ....................................................................................38

II.     A NEW TRIAL IS WARRANTED WHEN AN
        INSTRUCTION WRONGLY STATES THE LAW AND
        THE STATEMENT PREJUDICES THE RESULT ...........................39

III.    INSTRUCTION 11 WRONGLY STATED THE LAW ....................40

        1.      Big Time Timely and Properly Objected to Instruction
                11 ..........................................................................................42

        2.      The Court was Precluded from Deferring the
                Identification of Functional and Non-Functional
                Elements to the Jury ..............................................................42

        3.      Failure to instruct the jury on functionality necessarily
                created confusion ...................................................................45

        4.      Instruction 11 prejudiced the jury's determination of
                infringement ...........................................................................47

        5.      Instruction 11 prejudiced the Jury's Verdict of
                Anticipation as there was not Legally Sufficient
                Evidentiary Basis Supported the Anticipation Verdict.............51

                a.      The Standard of Anticipation of a Design Patent...........51

                b.      JOM Does Not Anticipate ..............................................54

                c.      Instruction 11 prejudiced the jury's consideration
                        of anticipation by permitting it to exclude
                        allegedly functional elements D'780 ..............................60

                d.      Marklyn failed to present any evidence that the
                        Lee reference anticipated D'780.....................................61

IV.     A NEW TRIAL IS WARRANTED AS A RESULT OF
        ERRONEOUS INSTRUCTION 11 ...................................................64

V.      CONCLUSION .................................................................................66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

Advanced Display Sys., Inc. v. Kent State Univ.,
    212 F.3d 1272 (Fed. Cir. 2000) ........................................................39, 40, 41

Ancora Techs., Inc. v. Apple, Inc.,
    744 F.3d 732 (Fed. Cir. 2014) ...................................................................38

Apple Inc. v. Samsung Electronics Co, LTD,
    --- F.3d ---, 2015 WL 2343543 (C.A. Fed (Cal.) 2015) ........................*passim*

Bernhardt, L.L.C. v. Collezione Euwpa USA, Inc.,
    386 F.3d 1371 (Fed. Cir. 2004) .................................................................40

Brooktree Corp. v. Advanced Micro Devices, Inc.,
    977 F.2d 1555 (Fed. Cir. 1992) .................................................................39

Cheese Sys., Inc. v. Tetra Pak Cheese & Power Sys., Inc.,
    725 F.3d 1341 (Fed. Cir. 2013) .................................................................51

Colida v. Sony Corp.,
    70 F.3d 130, 1995 WL 681478 (Fed. Cir. Nov. 16, 1995)...........................53

Commil USA, LLC v. Cisco Sys. Inc.,
    720 F.3d 1361 (Fed. Cir. 2013) .................................................................38

Contessa Food Products v. Conagra, Inc,
    282 F.3d 1370 (Fed. Cir. 2002) .................................................................63

Crocs, Inc. v. Int'l Trade Comm'n,
    598 F.3d 1294 (2010) ................................................................................53

Door-Master Corp. v. Yorktowne, Inc.,
    256 F.3d 1308 (Fed. Cir. 2001) .................................................................52

Egyptian Goddess, Inc. v. Swisa, Inc.,
    543 F.3d 665 (Fed. Cir. 2008) .....................................................35, 40, 43, 44

Hana Financial, Inc. v. Hana Bank,
    --- U.S. ---, 135 S. Ct. 907 (2015) ............................................................40

Hupp v. Siroflex of America, Inc.,
    122 F.3d 1456 (Fed. Cir. 1997) ............................................................45, 52

In re Balmer,
276 F.2d 405 (C.C.P.A. 1960) ........................................................53

In re Webb,
916 F.2d 1553 (Fed. Cir. 1990) ....................................................63

Integrated Tech. Corp. v. Rudolph Techs., Inc.,
734 F.3d 1352 (Fed. Cir. 2013) ....................................................38

Jamesbury Corp v. Litton Industrial Products, Inc.,
756 F.2d 1556 (Fed. Cir. 1985) ..............................................40, 53

LA Gear Inc v. Thom McAn Shoe Company,
988 F.2d 1117 (Fed. Cir. 1993) ........................................45, 49, 65

Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co.,
730 F.2d 1452 (Fed. Cir. 1984) ....................................................54

Markman v. Westview Instr., Inc.,
52 F.3d 967 (Fed. Cir. 1995) ........................................................43

Markman v. Westview Instruments, Inc.,
517 U.S. 370 (1996).........................................................40, 42, 44

Net MoneyIN, Inc. v. VeriSign, Inc.,
545 F.3d 1359 (Fed. Cir. 2008) ..........................................6, 52, 54

O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.,
521 F.3d 1351 (Fed. Cir. 2008) ....................................................42

OddzOn Products, Inc. v. Just Toys, Inc.,
122 F.3d 1396 (Fed. Cir. 1997) ...............................35, 42-43, 44

Retractable Techs., Inc. v. Becton, Dickinson & Co.,
653 F.3d 1296 (Fed. Cir. 2011) ..............................................53, 59

Richardson v. Stanley Works, Inc.,
597 F.3d 1288 (Fed. Cir. 2010) .............................................passim

Schumer v. Lab. Computer Sys., Inc.,
308 F.3d 1304 (Fed. Cir. 2002) ....................................................57

Sulzer Textil A.G. v. Picanol N.V.,
358 F.3d 1356 (Fed. Cir. 2004) ....................................................39

SynQor, Inc. v. Artesyn Techs., Inc.,
709 F.3d 1365 (Fed. Cir. 2013) ....................................................38

iv

Therasence, Inc. v. Becton, Dickinson and Co.,
    593 F.3d 1325 (Fed. Cir. 2010) ...............................................................6, 54

Townsend v. Lumbermens Mut. Cas. Co.,
    294 F.3d 1232 (10th Cir. 2002) ....................................................................39

United States v. Baker,
    508 F.3d 1321 (10th Cir. 2007) ....................................................................39

## Statutes & Other Authorities:

28 U.S.C. § 1295(a)(1) ...............................................................................2

28 U.S.C. § 1331 ........................................................................................2

28 U.S.C. § 1338 ........................................................................................2

35 U.S.C. § 102(a) ....................................................................................51

35 U.S.C. § 102(b) ....................................................................................51

35 U.S.C. § 102(e) ....................................................................................11

Fed. R. Civ. P. 50 .....................................................................................34

## **STATEMENT OF RELATED CASES**

No other appeal from the same civil action in the district court was previously before this or any other appellate court.

## **JURISDICTIONAL STATEMENT**

The District Court had jurisdiction under 28 U.S.C. §§ 1331 & 1338.  The jury entered its verdict of infringement regarding Head-N-Grill Litz, non-infringement regarding LEDLitz and Motion LED, and anticipation on August 12, 2014.  On September 15, 2014, Big Time filed its Renewed Motion for Judgment as a Matter of Law and for New Trial.  [#128]  On April 8, 2015, the District Court denied Big Time's Renewed Motion for Judgment as a Matter of Law and for New Trial. (A0001)  Big Time appealed on April 13, 2015. (A1884)  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.    Whether Instruction 11 wrongly directed the jury to identify functional features of the design patent when determining infringement and anticipation

2.    Whether the jury could have returned a different verdict had the District Court issued Instruction 11 without directing the jury to identify functional features of the design patent in suit before assessing infringement and anticipation.

3.    Whether a new trial on infringement and validity are warranted when substantial evidence did not support the jury's finding of non-infringement and anticipation.

## **INTRODUCTION**

This design patent case is directed toward a lighting accessory that features an ornamental design for a flexible attachment strip having a plurality of forward facing LEDs, as shown and described in Figures 1-9 of United States Design Patent 690,780.



Big Time Automotive Manufacturing brought suit against Marklyn for the sale of three identical products: LEDLitz, Head 'N' Grill Litz and Motion LED. On August 8, 2014, a Colorado jury returned a verdict of infringement regarding the Head 'N' Grill Litz.  Armed with Instruction 11 regarding the scope of D'780, the jury was charged with identifying and considering certain unidentified functional elements of D'780 when considering both infringement and anticipation.  The District Court, over Big Time's multiple objections, opted to wrongly defer its duty to define the scope of D'780, and wrongly instructed the jury to identify "functional elements" of the claims.  The District Court's last second addition of

functionality, without further guidance to the jury on the definition of functionality, caused prejudicial and reversible error.

There is not substantial evidentiary support for the jury's inconsistent verdict on infringement and anticipation. As demonstrated herein, the only differences between the infringing and non-infringing products relates to how the products are marketed. Similarly, the only similarities between D'780 and the proposed anticipatory reference relates to how they function, not how they appear to the ordinary observer. At trial, Big Time's evidence of infringement was not rebutted by either of Marklyn's two witnesses, John Phillips or Gabor Kiss. Further, all of the witnesses agreed that the anticipatory reference did not claim a flexible attachment strip for the forward facing LEDs. The witnesses also agreed that the anticipatory reference featured different LEDs (upward facing vs. forward facing), and a light impermeable casing (52) that gave the product a different look and appearance from D'780.



In fact, neither Kiss nor Phillips testified that the ordinary observer would

view the above reference and conclude that it contains all of the elements of D'780

"arranged or combined in the same way as recited in the claim**."** Therasence, Inc.

v. Becton, Dickinson and Co., 593 F.3d 1325, 1332 (Fed. Cir. 2010)(citing Net

MoneyIN, Inc. v. VeriSign, Inc., 545 F.3d 1359, 1371 (Fed.Cir. 2008)).  Mr.

Cheng, on the other hand, confirmed that the ordinary observer would not so

conclude when considering the anticipatory reference and D'780.  Substantial

evidence did not support the finding of anticipation. As the anticipatory reference

and D'780 have similar functions, District Court's decision to authorize the jury to

consider functionality in assessing anticipation prejudiced the result.

A new trial is warranted as Instruction 11 wrongly stated the law of

functionality and prejudiced the determination of both infringement and validity.

Further, substantial evidence did not support a verdict of non-infringement and anticipation.

## STATEMENT OF THE CASE

Big Time Automotive Manufacturing is a leading automotive lighting manufacturer based in Taiwan.  Yao Hung "Rick" Huang, is the owner and General Manager of Big Time.  Huang's father acquired Big Time in the 1970s and moved his family to the apartment above the main manufacturing floor for the small automotive accessory manufacturer.  (A1166) Under his father's leadership, Big Time focused its manufacturing efforts into the area of automotive lighting, in particular the 6-in fog light that Chrysler installed in its Jeeps.

Rick Huang got his start in the area of automotive lighting in his teenage years. (A1166)  After one year of high school, Huang opted to work the assembly line building lighting products during the day while attending school at night in the area of electrical engineering. (A1167)  Huang eventually graduated from assembly line to management. In 2000, Huang assumed the role of General Manager of Big Time and has been primarily charged with new product development, research and development. (A1164)  He has been awarded thirty patents in Taiwan and six in the United States for his innovations, with a dozen additional innovations pending before the USPTO.  (A1172-73) Today, Big Time offers over 200 different automotive lighting products, the majority of which

qualify as original equipment for placement in cars at the time of original

manufacture.  (A1165)  Roughly 20% of Big Time's product offerings fall into the

category of automotive aftermarket.

### A.    Big Time's Innovation

Following the 2007 AMPA Show in Taipei, Mr. Rick Huang began the

development of a new LED lighting strip.  (A1169)  He produced an initial

prototype in the summer of 2007.  (A1169-70)   Huang was the sole inventor on

this project and he ultimately produced a working prototype by the AMPA Show in

Taipei show in 2008.  (A1180-84)



(A0599)

The following year, Pilot Automotive negotiated the exclusive right to

distribute the forward facing LED lighting strip in the United States. By October of

2009, Pilot and Big Time had placed the product in stores across the United States

and Mexico.

Huang described his development process in detail during trial. In 2007, Huang assembled his LED suppliers and his LED product development team to describe his idea for a product that featured forward facing LEDs on a flexible attachment strip. (A1176) Initially, the LED suppliers were unable to provide him with LEDs that met his specification as they were all upward facing (A1177):



As illustrated, the prior art LED strips all featured center mounted LEDs that directed light perpendicular to the attachment strip. Huang rejected this prior art as being inconsistent with his conception. (A1178)

Huang also rejected convention and directed his development team to place the LEDs at or near the edge to of the attachment strip. (A1180) Mr. Gabor Kiss, the director of product development at Marklyn, agreed that placement of the LEDs at the edge of the strip bucked convention. Mr. Gabor Kiss noted that center mounted LEDs are more structurally sound and stable:

Q:      But going into this process, you understood that you wanted to
        have a durable strip, correct?

A:      Yes.

Q:      And the reason you wanted to have durability is because this is
        going to be something on the outside of a motor vehicle?

A:      Yes.

Q:      And you understood, as you were looking at flexible attachment
        strips, that prior designers to you had placed the LED in the center
        to provide durability for the LED and the strip itself?

A:      Yes.

Q:      So when you moved the LED to the side, you lost a measure of
        durability, correct?

A:      Yes, but we increased light output.

Q:      But you lost a measure of durability, which is what I'm focused
        on, correct?

A:      Yes.

Q:      So that was something that the prior art had, essentially taught you
        not to do, and you bucked the trend by going to the edge, correct?

A:      Yes.

(A1703-04)  The design choices made by Huang went against existing trends and

teachings from the manufacturers.

        Exhibit 100 reflected Huang's initial prototype. (A1179) It featured a thin

board with a row of forward facing LEDs aligned along the edge of the board.

(A1180) As the initial board lacked desired flexibility, Huang replaced the original

10

thin board with a flexible attachment strip in advance of photographing his second generation prototype in April of 2008. (A1181)  The prototype was preserved and shared with the jury.  (A0599)   The addition of a more flexible and soft board did not impact the overall appearance of the original conception and prototype that ultimately appeared in Huang's patent application.  (A1183-84)

Based upon the above evidence, and for purposes of 35 U.S.C. 102(e), the District Court ultimately ruled that Huang had conceived and reduced his invention to practice by April 30, 2008. (A0338)

### B.    United States Design Patent 614,780

On December 22, 2009, Huang caused the filing of an application for a design patent.  (A0025)  On April 27, 2010, the United States Patent and Trademark Office issued United States Design Patent D'614,780 to Huang with nine figures.  In the Description, Huang states that the "light illuminated from the LEDs is shown in broken lines for illustrative purposes only and forms no part of the claimed design." (A0025)  Despite any number of functional arguments advanced by Marklyn at trial tied to brightness, illumination plays no role in the claim of D'780.



Fig. 1

Fig. 2

Fig. 3

Fig. 4

Fig. 5

Fig. 6

## C.    LEDLitz, Head 'N' Grill Litz and Motion LED Infringe D'780

In April of 2009, Pilot Automotive and Marklyn Group presented their

respective product offerings to AutoZone for placement in stores over the coming

year.  Unbeknownst to the other, both touted an aftermarket lighting product

12

featuring forward facing LEDs on a flexible attachment strip as depicted in D'780. (A1566-69)  Pilot presented its "Flexi-Lite" product, as manufactured by Big Time, and Marklyn presented the LEDLitz product, as manufactured by Shenzhen Mingxue.  The reaction was overwhelmingly positive, with AutoZone stating "I think we got a winner here." (A1451)  According to Mr. John Phillips, founder and President of Marklyn Group, "with the introduction of this product by you and Pilot in 2009, a new segment was born."  (A1566)  These products did not replace an existing product line.  (A1565)

On behalf of Marklyn, John Phillips led the 2009 presentation at AutoZone's Memphis headquarters.  (A0667)  At that time, Marklyn set up the LEDLitz[1] products for display purposes. (A1448-49)  Phillips' PowerPoint described the accused product as "Innovative OEM Styling." (A0644, A0705)  David Ingvardsen, the category manager for AutoZone, simply said "wow" when presented with the accused products: "So, consequently, he's looking for the next exciting thing to put on to his shelf and attract attention.  That's why we got the wow factor that was built in, because he was excited equally about the product category and what we were presenting." (A1449)  Phillips confirmed that the product he presented in April of 2009 looks exactly as the accused products look

---

[1] Marklyn initially branded the accused product as LED Headlitez.  Prior to coming to market in October of 2009, Marklyn changed the name of the accused product to LEDLitz. (A1545)

today. (A1450)  As a result of the meeting with AutoZone, the "LEDLitz" product was placed in AutoZone stores under part numbers 77015, 77016, 77017 and 77018.  The parts differed only in the color of the LEDs that were used, a feature that is not claimed in D'780.  (A1452)

In 2010, Marklyn offered a longer version of the LEDLitz under a newly branded product entitled "Head 'N' Grill Litz", which was sold under part number 77223.  (A0665)  The "Head 'N' Grill Litz" differed from LEDLitz only in that the former came in 36 inch lengths whereas the LEDLitz came in 14 inch lengths. (Compare A0665 with A0652)  Even in 2010, after D'780 issued, Marklyn advertised the accused LEDLitz as being "innovative, hot, new."  (A0652)  The newly offered Head 'N' Grill Litz was described as featuring the "New edge mount LEDs."  After suit was initiated, Marklyn introduced "Motion LED" sold under part numbers 77512 and 77513.

Phillips confirmed that the accused forward facing LED strips offered by Marklyn have remained in largely the same form since they were initially presented in 2009 as the products have been a commercial success that clients have praised on a regular basis.  (A1564)

The LEDLitz and Motion LED were marketed differently from the Head 'N' Grill Litz.  LEDLitz was marketed as being thin enough to be mounted around a headlight for the purposes of operating as an ancillary day time running light.

14

(A1507-08)  Motion LED was marketed as "driving light function and sequencing turn signal function all in one."  (A1506)  In contrast, Marklyn placed a warning on the back of the Head 'N' Grill Litz directing the user to refrain from using the Head 'N' Grill Litz while the vehicle is in motion.  (A 1158-59)

### D.    Big Time brought suit to halt Marklyn's infringement

On March 3, 2010, Big Time provided Marklyn with the opportunity to stop selling infringing products.  (A0030)  During the first quarter of 2011, Big Time subsequently and successfully enforced D'780 against Custom Accessories through an action filed in the United States District Court of the Southern District of California.  (A1290-92)  On July 6, 2011, Big Time turned to Marklyn and filed suit in the United States District Court for the District of Colorado.  (A0028) Marklyn filed its answer on October 9, 2011 and asserted the defense of anticipation and no infringement. (A0046-0048)  On October 10, 2012, the District Court entered its order on claim construction and construed D'780 as follows:

> "The ornamental design for a flexible attachment strip having a plurality of forward facing LEDs, as shown and described."

(A0127)  The District Court expressly addressed Marklyn's functionality concerns and rejected the following proposed construction presented by Marklyn:

> "The ornamental features of D'780 design are shown by its overall appearance, but include the following: (1) a plurality of forward facing rectangular LED lights three times thicker than the strip with

only one transparent side facing an edge of the strip a pictured
positioned near but not on the edge of a flexible attachment strip; (2)
relative equidistant positioning of the rectangular LEDs spaced apart
four times greater than the space occupied by the LEDs and mounted
atop the strip; (3) a flexible flat and thin attachment strip of
indeterminate length  that is three times wider than the rectangular
LEDs and twelve times wider than it is thick."

(A0125-26)   The District Court found that the above construction was not

"required to distinguish D'780 from the prior art or to limit its reach to only

the non-functional aspects for the design."  (A0126)

Marklyn did not subsequently move to amend the claim construction

entered by the Court to include elements of functionality, if any.  On March

5, 2013, Marklyn moved for summary judgment on all claims.  [#43]  On

February 20, 2014, the District Court denied Marklyn's motion for summary

judgment and the matter was set for a five-day jury trial set to commence on

August 1, 2014.

In advance of trial, Big Time moved to exclude Marklyn's expert on

the topic of functionality.  (A0130)  In response, Marklyn argued that the

District Court should consider the expert's testimony in assessing the scope

of the design patent.  (A0186-90)  Marklyn proposed a jury instruction for

purposes of addressing the identified functional features.  (A0221)  On July

18, 2014, the District Court excluded Marklyn's functionality expert, noting

the "Marklyn fails to explain how any evidence relating to the visibility and

illumination provided by defendant's accused product is relevant to the

court's consideration of the scope of the design claimed in *plaintiffs'*

patent." (A0275) (emphasis in original).  The District Court then noted:

> The proper construction and scope of the patent is an issue for the court.  The court has construed the patent as "[t]he ornamental design for a flexible attachment strip having a plurality of forward facing LEDs, as shown and described."  The description of D'780 specifically states that "[t]he light illuminated from the LEDs is shown in broken lines and for illustrative purposes only and forms no part of the claimed design."  Given this disclaimer, **the relative illuminance offered by plaintiff's design plainly is not within the scope of what the patent claims.**

(A0276) (citations omitted)(emphasis added).

**E.     Big Time's evidence of infringement goes unrebutted at trial.**

Mr. John Cheng, Vice President for Marketing and New Product

Development at Pilot Automotive, prepared a report of infringement regarding the

LEDLitz, Motion LED and Head 'N' Grill Litz.  At trial, Cheng presented Exhibits

102, 103 and 104 for the purposes of illustrating and confirming that all three

products infringe D'780, respectively. (A1039-64)  Cheng showed the jury D'780

and the LEDLitz products as outlined in Exhibit 102.  (A1047-48) According to

Cheng, "to any observer its identical." (A1047)





(A0634-35)  Cheng then turned to the Motion LED.  (A1050) Utilizing D'780 and

the product, Cheng testified: "Looking at the physical features of the product right

here as we see it, you can't tell the difference.  You see the LED lights mounted to

the side, you see the flatness of the design.  That's all the ordinary observer would

look at when shopping for this thin, flat LED." (A1052)    Cheng used Exhibit 103

to illustrate his testimony. (A0636-37)

Cheng then turned to the Head 'N' Grill Litz product. (A1052) Cheng

demonstrated how the product and D'780 are the same, as depicted in Exhibit 104

(A1053):

| '780 Patent Figures | Exemplar Marklyn Accused Product (Alpena Part # 77512) |
|---|---|
|  Fig. 1 |  |
|  Fig. 2 |  |
|  Fig. 3 |  |
|  Fig. 4 |  |

| '780 Patent Figures | Exemplar Marklyn Accused Product (Alpena Part # 77512) |
|---|---|
|  Fig. 5 |  |
|  Fig. 6 |  |

(A0638-39)

Cheng did not consider the accused products and D'780 in vacuum, however. (A1053)  After being presented with the claimed prior art, D'780 and the accused products, Cheng confirmed that the ordinary observer would be more likely to confuse the accused products with D'780 with a full view of the prior art:

> A:     My opinion is, if you compare the two products side by side, you'll see an ordinary observer who will see this is absolutely identical as compared to the other cited patents. If you look at the JOM, how square his is and the other bra attachment [sic].  The whole configuration is different. If you look at that, which I did, it's just hands down.  The two products are identical where the other two cited patents are not.
>
> Q:      So in addition to looking at the Marklyn products and the patent, you looked at the prior art to see if that would change your mind?
>
> A:     Yes.

(A1040, 1057, 1058, 1060, 1064)  Cheng concluded: "If I'm holding a '780 patent and I'm going to shop for an LED strip, I would immediately gravitate toward the Marklyn because it's thin, ribbon-like with LED mounted strictly to one side, not a square, not a different shape."  (A1064)

Marklyn did not rebut this testimony at trial.  Marklyn presented testimony from John Phillips, President of Marklyn Group, and Gabor Kiss, its director in charge of new lighting products including the accused products.  Despite being on the stand for three days, neither Phillips nor Kiss offered testimony on the topic

infringement.  As a result, Cheng's report and trial testimony of infringement is

uncontroverted.  (A1039-64; A0634-39)

Given the absence of any evidence contesting infringement, Big Time did

move for directed verdict at the close of evidence.  (A1765-69)  The District Court

denied the motion. (A1793-95)

### F.    Marklyn had a number of design alternatives available rendering D'780 ornamental and non-functional

Viable design alternatives existed, rendering the question of legal

functionality irrelevant. (A1563-1566; 1682)  Both parties presented evidence

regarding the availability of a number of available alternative designs that

accomplished the function of producing a side emitting, flexible LED strip.  John

Cheng testified that a variety of prior art references provided viable alternatives

and that accomplished the purported function of emission of light to the side

through different designs.  (A1050-51; 1063-64; 1084)  Kiss agreed that there were

a number of alternative designs available to Marklyn, and others, that would not

infringe D'780.  (A1726)  In fact, Mr. Phillips confirmed that the appearance of the

LEDs strip could have been changed after notice of D'780  by adopting any

number of design alternatives.  (A1560-66)

### G.    Jury Instruction Conferences and Instruction 11 on Infringement

Under the District Court's standing final pretrial order, the parties submitted

stipulated jury instructions on July 8, 2014 by email sent directly to chambers.

(A1885)  Relevant to this appeal, the parties submitted a stipulated jury instruction

entitled "Stip-12: Design Patents – Interpretation of Patent Claims."  (A1906)  At

the conclusion of the third trial day, the Court presented the parties with a set of

jury instructions and scheduled a charging conference for the end of the fourth day

of trial.  The District Court renumbered Stip-12 as Instruction 11 and presented it

to the parties in unaltered form:

> Before you decide whether Marklyn has infringed the design patent asserted by Huang and Big Time Auto, or whether that design patent is invalid, you will have to understand the design patent claims.
>
> Unlike utility patents, a design patent can only have one claim. That claim covers all the figures in the patent.  Each design patent contains multiple drawings to illustrate the claimed design.  The scope of the claim encompasses the design's visual appearance as a whole.  It does not cover a general design concept, and is not limited to isolated features of the drawings.  All matter depicted in solid lines contributed to the overall appearance of the design.
>
> It is my job as a judge to interpret for you what is claims by the patents.  You must accept my interpretations as correct.  My interpretations should not be taken as  an indication that I have an opinion one way or another regarding the issues of infringement and invalidity.  The decisions regarding infringement and invalidity are yours to make.  When considering the design patent, you should view certain features in the drawings in this way;
>
> D'780 claims the ornamental design for the flexible attachment strip having a plurality of forward facing LEDs, as shown in Figures 1-9 and described in the patent.  The broken lines in D'780 constitute unclaimed subject matter.

(A1908)  While Marklyn initially objected to the above instruction, the objection

was withdrawn and the Court accepted the Instruction 11.  (A1650: "**The Court**:

Instruction 11 is approved.")

On the final day of trial, the District Court conducted a final jury instruction

charging conference.  (A1792-1809)  Minutes before convening the final charging

conference, the District Court issued a final set of jury instructions. Despite having

approved Instruction 11, the District Court, on its own motion, added the following

language to Instruction 11:

> Any purely functional feature should not be considered in determining
> infringement. You may consider only the ornamental feature of the
> claimed design.

(A0332) Big Time objected, noting that the instruction improperly deferred the

question of claim construction to the jury. (A1797) In its timely filed Jury

Instructions Brief, Big Time objected to Marklyn's similarly worded Non-

stipulated Instruction 2 entitled "Functionality of Features." [#98, Jury

Instructions Brief, p11-12], noting:

> The issue of whether certain features of the design shown in the '780
> patent are "functional" rather than "ornamental" is a question of the
> scope of the patent. Richardson v. Stanley Works, Inc., 597 F.3d
> 1288, 1294 (Fed.Cir. 2010)("when the design also contains
> ornamental aspects, it is entitled to design patent whose scope is
> limited to those aspects alone and does not extend to any functional
> elements of the claimed article.") (emphasis added)). As such, it is a
> matter of claim construction, which the Court must decide as a matter
> of law. Markman v. Westview Instruments, Inc., 517 U.S. 370, 372
> (1996). No additional instruction should be given to the jury telling
> them, in effect, to ignore parts of the patented design when carrying
> out the ordinary observer test for infringement. Rather, prior to
> charging the jury and after having heard presentation of all evidence,
> the Court should decide the claim scope issue of whether the two
> elements focused on by Marklyn are functional.

Id. Rather than conduct a second claim construction hearing, the District

Court subsequently rejected Marklyn's functionality arguments:

> Mr. Railsback opinion clearly assumes that the primary (if not sole) function of the flexible LED Strips is to serve as daytime running lights for cars, thus making the functions of visibility and illuminance of utmost importance.    However, D'780 is not so limited, and defendant's product itself is not marketed for that singular purpose, but instead represents that it can be mount[ed] virtually anywhere," including vehicle interiors.  (See Plf. Reply App.  Exh. 6 [#93], filed July 9, 2014.)  The evidence thus suggests that these products function primarily as accent lighting or vanity decoration.  There is nothing in Mr. Railsback's opinion to suggest that the LEDs must be edge-mounted and forward facing in order to achieve that purpose, and in fact, the putative availability in the market of other configurations for flexible LED strips that serve that same purpose suggests otherwise.

(A0277)

Thereafter, the District Court did not invite additional arguments on the topic of functionality, nor did it change or alter its original claim construction ruling to include an identification of functional features.  The 11th hour change to the jury instructions was not only inappropriate but was unsupported by the Court's prior evidentiary findings.

During closing arguments, Marklyn used the new language in the Instruction 11 to resurrect non-infringement and anticipation arguments that had not been articulated from the witness stand.  Relying upon a non-infringement argument that was expressly rejected by this Court in Apple v. Samsung, --- F.3d ---, 2015 WL 2343543 *9 (C.A. Fed (Cal.) 2015), Marklyn's counsel argued that the jury could identify certain functional features of D'780 and exclude them in their analysis:

> "Now, having said that, let's take a look at D'780 and try to determine what this is all about here. If you look at D'780, you will see that it

24

has a flexible strip and it has a plurality of forward facing LEDs as shown and described.  That's it.

What it shows is LEDs that are forward facing, and it shows LEDs that, on this particular strip, are mounted what I would call near the edge, not really on the edge, but near the edge.

So if there's anything about this patent that's different than anything before, it is those two features.  But those two features are functional. You are instructed by Judge Blackburn, when you are considering infringement, you should consider – not consider the functional features of the patent, only their ornamental aspect.

Well, what does that mean?  Let's take a look at D'780 again. If you set aside the idea that the LEDs are forward facing and you set aside the idea that they are near edge mounted, what is left?  I suggest there there's virtually nothing left.

(A 1850-51)  Putting aside the fact the District Court should be instructing the jury on the scope of the patent, the District Court and counsel improperly directed the jury to identify and ignore all functional features of D'780.  This prejudice was amplified when the District Court did not identify for the jury a single functional feature and left it to the jury to (1) interpret the meaning of functionality under the law and (2) improperly exclude those features from the consideration of the overall appearance of the patent.  Counsel for Marklyn concluded by arguing that D'780 essentially claims nothing as the features are all functional:

Once you have properly taken into account the reality that the principal features of the '790 patent are forward facing LEDs and edge mounted LED, and once you conclude that those features are functional, there is little left of D'780.

(A1853)  Put differently, Plaintiff argued that if there is nothing left to the

patent, everything anticipates, and nothing infringes.

### H.    Anticipation and Jury Instruction 16

Instruction 16 on anticipation was accepted by the District Court after

adopting Defendant's proposed modifications. (A1806-1807)  As a result, the

District Court instructed the jury as follows:

> In this case, defendant claims that plaintiff's product was anticipated
> by JOM catalogue, flyer and utility model.
>
> The same standard of substantial similarity that applied to
> infringement also applies to the affirmative defense of anticipation.
> That is, the single prior art reference and the claimed design patent are
> substantially the same if, in the eye of an ordinary observer, giving
> such attention as a purchaser usually gives, the resemblance between
> the two designs is such as to deceive such an observer, inducing him
> to purchase one supposing it to be the other.  You should consider
> perceived similarities or differences between the claimed design and
> prior art reference.  Minor differences should not prevent a finding of
> anticipation.

(A0339)  The Defendant and the District Court limited the scope of anticipatory

prior art to the JOM catalogue, flyer and utility model ("JOM").  This limitation

has not been appealed, nor could it as Marklyn stipulated to it. (A1806-07)

Instruction 11 provided the jury with the ability to find anticipation simply

because the prior art reference and D'780 function in the same fashion.  As

acknowledged by Marklyn's own witnesses, JOM is not identical to D'780 in all

material respects, nor does it disclose all of the elements of D'780 within the four

26

corners of the catalogue, the flyer or the utility model patent.  The likelihood that Instruction 11 infected the jury's consideration of anticipation is high given the fact that Marklyn's two witnesses agreed that the prior art reference and D'780 look different and accomplish the same function through different means.

### 1.    JOM and LED-Stripe

JOM is a German-based automotive parts manufacturer much like Marklyn and Pilot Automotive.  Marklyn became exposed to JOM when John Phillips and his wife walked into their booth at the 2008 Automechanika Show in Frankfurt, Germany.  (A1430)  JOM was featuring the "LED-Stripe," a side emitting LED strip that featured a string of upward projecting LEDs cast into a flexible lamellar carrier and wrapped with a light isolating PVC.  Phillips picked up the catalogue, which was later marked as Exhibit 34.  (A0600-03)  Phillips picked up a flyer for the LED-Stripe, which was marked as Exhibit 35.  (A0604)  Phillips also purchased an LED-Stripe to bring home for his product development team to study.  (A1430-37)

### 2.    German Utility Model Patent filed by JOM

On September 11, 2008, the German Patent and Trademark Office announced that JOM Car Part & Car had submitted an application for a German Utility Model identified as "Luminous row with a flexible, lamellar carrier." (A0400-10)  JOM claimed:

27

1.    Luminous row with a flexible lamellar carrier (22) which defines a longitudinal direction (25) and a least has a wide side (30, 32) and a small side (34, 36) that goes out in a longitudinal direction (28) with a first and second flexible conductor (24, 26), which are arranged on the carrier (22) and run in the longitudinal direction (28) and with a variety of light elements (40), that are arranged on the carrier (22) in the longitudinal direction (28) next to each other and connected with the first and second conductors (24, 26) electrically, identified in that the light elements (40) are arrange in the area of the small side (34) and that is arranged around the carrier (22) there is a flexible, light impermeable casing (48) which covers the wide side (30, 32) and exposes the small side (34) at least in the area of the light elements.

(A0408)  Figure 1 provides the relevant detail:



JOM proposed the above configuration as an advancement over the prior art as it featured a flexible lamellar carrier and a flexible light impermeable casing.

(A0402)  The lamellar carrier is made of "transparent PVC material."  (A0403) The lamellar carrier is rectangular in shape as defined by two "wide sides" and two "small sides."   The luminous row consists of a string of lights, including LEDs,

electrically connected to two conductors that extend longitudinally across the carrier. The LEDs are positioned "in the area of the small side" and suspended within the transparent PVC material in such a fashion that lights project out of the small side of the carrier. (A0402, 0404)

Notably, the lights, including surface mounted LEDs, are connected through "connection wires." (A0405) JOM expressly disclaimed the use of a flexible attachment strip as claimed in D'780. While D'780 does not specify the form or type of circuit board, it is clear that JOM expressly disclaimed the use of an attachment strip for purposes of creating a flexible luminous row. JOM expressly taught against the use of thin attachment strips as claimed in D'780:

- "Connection wires, in contrast to pressed or etched conductor paths, can be laid freely and flexibly."

- "Connection wires with flexible loads are more robust than pressed or etched conductors, which is of a great advantage in regards to the flexible carrier from the new luminous row."

- "In the preferred design examples, the SMD light diodes are contacted through flexible wires in contrast to standard usage, which are soldered on to the contact surfaces of the SMD light diodes."

(A0404) JOM's reference to SMD light diodes is particularly telling as it confirms that the luminous row does not feature an attachment strip. As explained by JOM,

"SMD is the abbreviation for Surface Mount Devices.  This term describes a
construction for light diodes, which is distinguished in that the light diodes have no
individual connection wires.  The contact is carried out instead through to separate
contact surfaces, which are arranged on the casing or chip body of the light diodes.
Typically, SMD components are directly arranged on the surface of a circuit board
and soldered to the contact surfaces."  Id.  Rather than use an attachment strip as
featured in D'780, JOM suggested soldering the SMD diodes to the two connection
wires.  Id.

Next, JOM features a light impermeable casing that "surrounds the carrier in
a U-shape, namely on the upper side 30, the rear smaller side and the upper side
32."  (A0405) The light impermeable casing is "a rubber like casting material
made of PVC, which is installed in a thin layer around the carrier and the lighting
elements and then hardened by the flexible casing.  It is understood that the smaller
side of the carrier with the light elements  in this design is also free enough to so
that the light from the light elements can escape."  (A0403)  As a result of the
casing, the ordinary observer cannot visualize the placement of the LEDs within
the lamellar carrier.  The carrier gives the flexible luminous row the appearance of
molding or weather stripping, an appearance that is distinct from the design
disclosed in D'780.  (A1710)

### 3.    Marklyn's testimony regarding the differences between the JOM reference and D'780.

None of Marklyn's witnesses testified that the ordinary observer would conclude that JOM disclosed all of the elements of D'780 arranged or combined in the same way as recited in the claim.  Rather, Phillips admitted that Marklyn's products look different from JOM, an admission that fundamentally undermines JOM as an anticipatory reference.  At trial, Marklyn did not attempt to rebut Cheng's testimony that Marklyn's products infringe D'780.  Thereafter, the jury found that Marklyn's Head 'N' Grill Litz infringe D'780.  With this back drop, Phillips was asked directly if the accused products resembled JOM:

> Q:    Would you, first of all, agree that the product that you're selling today is quite a bit different from the JOM product you saw in September of 2008?
>
> A:    It has –
>
> Q:    From an appearance standpoint.
>
> A:    From strictly appearance, and that's all, yes.

(A1579)  Phillips explained that "We don't use lamellar.  This is printed circuit board, flexible printed circuit board.  But the difference being in the construction of the two products. . . ."  (A1581-82)   Kiss explained that "I distinguish our product from the JOM product because our product does not have the black casing."  (A1706)  The fact that an infringing product differs on such an obvious level from the anticipatory reference should have resulted in directed verdict.

The differences in manufacturing costs confirm the differences in the two designs. Kiss, charged with bringing a side emitting LED strip to market in 2008, initially investigated a partnership with JOM. He learned that the JOM product retailed for $80, an exceptionally high price. (A1713) By contrast, the accused products that featured the flexible attachment strip vs. a lamellar carrier, retail for $24.99. (A1714) Kiss confirmed that the price was driven by the manner in which the JOM product was manufactured. First, two copper wires were soldered to a plurality of LEDs. (A1714) Next, the copper wires and attached LEDs were "strung" through a channel and the lamellar is injected. (A1714-15) The JOM reference featured upward projecting LEDs, rather than side projecting LEDs as claimed in D'780 patent. (A1715)("They took one of the upward facing LEDs we've seen from the prior art, turned it so that it was on its side.") JOM had to position the LEDs so that they projected out of the small side of the lamellar carrier. (A1715)

In the end, JOM's LEDs are not mounted on a flexible printed circuit board. (A1715) JOM used upward facing LEDs. (A1715) Kiss confirmed that the casing and the carrier are the two predominant features of the JOM reference: "I believe that they co-exist, meaning the transparency is the flexible lamellar carrier and the impermeable casing is the black outer coating." (A1712) As claimed, JOM is also covered by a light impermeable casing which hides the LEDs. (A1706) Even if

32

you remove the casing, the visual appearance of the lamellar carrier with LEDs compared to the flexible attachment strip with LEDs is vastly different.  The LEDs in D'780 are not visible in Figure 2 (i.e. from below the strip) as the flexible attachment strip is opaque.

Cheng agreed with the above testimony.  He noted that the JOM product is "a thick rectangular shape as opposed to a ribbon like shape" as disclosed in D'780.  (A1151)  He also noted that the consumer would pick up the JOM product and note that "its black on both sides, except for the tape.  You can only see if from the side, which is thick, okay, in comparison to a thin LED strip of anything, whether the LED is mounted to the front or not.  The nature of itself is a completely different design, different nature.  Now, I can see with my glasses on that I think the ordinary observer would see on the flat side, same as the drawing you saw earlier, that the LEDs are mounted dead center on the side of the strip.  It is mounted inside, embedded into this clear substrate."  (A1151-52) The LEDs are actually center mounted within the small side of the lamellar carrier: "Well, if you turn this rectangle shape upward where the LED is facing upward and you look at the strip, those LED are dead center mounted within the substrate. That's what I meant by center mounted." (A1122)

### 4.     Similarities between JOM and '780 patent are functional

Improper reliance upon functional similarities produced an erroneous result. (A 1481-82, 1611)  At trial, Marklyn focused its comparison upon the fact that JOM and D'780 are flexible and feature LEDs that project light parallel to the strip, rather than perpendicular to the strip.  (A1481-82, 1592)

Given this Court's high standard on what qualifies as an anticipatory reference in a design patent case, and as the only real basis for anticipation is founded in functionality, Big Time did move for directed verdict on anticipation. (A1783-1788)  The District Court erred in failing to direct verdict in favor of Big Time on anticipation.

### I.     Verdict of Infringement, Non-Infringement and Anticipation

The jury found that the Head 'N' Grill Litz infringed D'780.  The jury found that the LEDLitz, the shorter version of the Head 'N' Grill Litz, did not infringe D'780. The jury also returned a verdict of anticipation.  Following trial, Big Time timely filed a renewed motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure.  [#128]  The District Court denied the motion. (A0001)

# SUMMARY OF THE ARGUMENT

A new trial on infringement and anticipation is warranted as Instruction 11 misstated the law and irreparably prejudiced the deliberations. The jury's verdict of non-infringement and anticipation was directly tied to Marklyn's arguments that LEDLitz is functional and that the anticipatory reference served the same function as D'780. The District Court permitted the jury to reach these erroneous legal conclusions when it wrongly instructed the jury that it should identify functional elements, if any, of D'780 in considering both infringement and anticipation. As recently confirmed by this Court in Apple Inc. v. Samsung Electronics Co, LTD, --- F.3d ---, 2015 WL 2343543 *9 (C.A. Fed (Cal.) 2015), functional elements of a design patent must be considered in conjunction with the ornamental features of the design patent. Not only did the District Court invite the jury to place undue emphasis on alleged functional features, the District Court committed prejudicial error by delegating to the jury its obligations under Egyptian Goddess and OddzOn to identify and describe the scope of the patent, including functional elements. Even assuming the jury should have been instructed to openly explore the question of functionality, which this Court in Apple expressly rejected, the District Court erred in failing to provide the jury with an instruction regarding the law of functionality, particularly when Big Time requested such an instruction in its Jury

Instruction Brief. As Instruction 11 wrongly directed the jury to define the scope of the patent, a new trial is warranted.

Substantial evidence did not support the jury's verdict of non-infringement. Mr. John Cheng was the only witness to testify regarding infringement. No witness testified in rebuttal and no evidence was presented that an ordinary observer would conclude that the LEDLitz and Motion LED do not infringe. The only difference between the product found to infringe (Head 'N' Grill Litz) and the product found to non-infringe (LEDLitz) arises from the functional benefits identified in Marklyn's advertising. As there is no ornamental difference between LEDLitz and Head 'N' Grill Litz, the verdict can only be explained by reference to Instruction 11. As Big Time properly moved for directed verdict, objected to Instruction 11, and renewed its motion for judgment as a matter of law, a new trial on infringement is warranted.

The District Court further erred when it failed to direct verdict in favor of Big Time on anticipation after Big Time verbally moved for judgement as a matter of law at the close of evidence and after it filed a renewed motion after the verdict of anticipation was rendered by the jury. JOM is visually different, with distinct visual elements that strongly differentiate it from D'780. Namely, JOM claims a light impermeable carrier and a rectangular lamellar casing. It expressly excludes the use of a ribbon like, opaque strip, which is a predominant feature of D'780.

Based upon the differences, John Cheng testified that the ordinary observer would not confuse JOM with D'780.  Marklyn's witnesses did not address the ordinary observer standard.  Rather, Marklyn's witnesses focused upon the fact that JOM and D'780 function is similar ways while acknowledging that the infringing product has a different visual appearance.

The decision to issue Instruction 11 over Big Time's objection, and the failure to instruct the jury on the law of functionality, produced a result where the same product was found to infringe when marketed as an ornamental light, and to not-infringe when marketed as a day-time-running light.  Accordingly, Big Time requests that the court reverse and remand for additional proceedings and a new trial on infringement, anticipation and damages.

# ARGUMENT

## I.    STANDARD OF REVIEW APPLICABLE TO THE ISSUES PRESENTED

This Court reviews the legal sufficiency of jury instructions *de novo*.

Commil USA, LLC v. Cisco Sys. Inc., 720 F.3d 1361, 1365 (Fed. Cir. 2013).  A

new trial is warranted when an instruction was erroneous and "could have"

changed the result. Id., at 1366-67.  As Instruction 11 relates to the scope of D'780,

this Court reviews design-patent claim construction *de novo*. Richardson v. Stanley

Works, Inc., 597 F.3d 1288, 1293-94 (Fed. Cir. 2010); Ancora Techs., Inc. v.

Apple, Inc., 744 F.3d 732, 734 (Fed. Cir. 2014).

Applying regional circuit law (here that of the Tenth Circuit), this Court

reviews the denial of a JMOL motion *de novo*, reversing "when a party has been

fully heard on an issue and there is no legally sufficient evidentiary basis for a

reasonable jury to find for that party on that issue." Integrated Tech. Corp. v.

Rudolph Techs., Inc., 734 F.3d 1352, 1356 (Fed. Cir. 2013) (quotation omitted).

"Anticipation is a question of fact, and this court reviews the jury's findings for

substantial evidence." SynQor, Inc. v. Artesyn Techs., Inc., 709 F.3d 1365, 1373

(Fed. Cir. 2013).

## II.    A NEW TRIAL IS WARRANTED WHEN AN INSTRUCTION WRONGLY STATES THE LAW AND THE STATEMENT PREJUDICES THE RESULT

In the 10th Circuit, the appropriateness of a jury instruction is reviewed by examining whether as a whole, the instructions accurately informed the jury of the issues and the governing law. United States v. Baker, 508 F.3d 1321, 1324 (10th Cir. 2007).  Failure to properly instruct the jury requires a new trial "if the jury might have based its verdict on the erroneously given instruction." Townsend v. Lumbermens Mut. Cas. Co., 294 F.3d 1232, 1242 (10th Cir. 2002).

Under the law of the Federal Circuit, "a jury verdict will be set aside, based on erroneous jury instructions, if the movant can establish that 'those instructions were legally erroneous,' and that 'the errors had prejudicial effect.'" Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1363 (Fed.Cir. 2004) (quoting Advanced Display Sys., Inc. v. Kent State Univ., 212 F.3d 1272, 1281 (Fed.Cir. 2000)). Whether a jury instruction is legally erroneous is a question of law. See Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1570 (Fed.Cir. 1992).

A party seeking to alter a judgment based on erroneous jury instructions must establish that (1) it made a proper and timely objection to the jury instructions, (2) those instructions were legally erroneous, (3) the errors had prejudicial effect, and (4) it requested alternative instructions that would have remedied the error. Advanced Display Sys., Inc. v. Kent State Univ., 212 F.3d

1272, 1281 (Fed.Cir. 2000). An instruction that is defective because of a

misstatement of law is not cured simply by a correct statement appearing

elsewhere. Jamesbury Corp v. Litton Industrial Products, Inc., 756 F.2d 1556, 1560

(Fed.Cir. 1985). Once the error is confirmed, the Court should conclude whether

"a jury might properly have returned a verdict in" Big Time's favor. Id.

## III.    INSTRUCTION 11 WRONGLY STATED THE LAW.

As recently affirmed by the Supreme Court of the United States in Hana

Financial, Inc. v. Hana Bank, --- U.S. ---, 135 S.Ct. 907, 912, n.2 (2015) "the task

of construing patent terms falls to judges and not to juries." See Markman v.

Westview Instruments, Inc., 517 U.S. 370, 388 (1996). The District Court's last

minute decision to allow the jury to identify and consider functionality was directly

at odds with this Court's *en banc* decision in Egyptian Goddess, Inc. v. Swisa, Inc.,

543 F.3d 665, 680 (Fed. Cir. 2008). "Where a design contains both functional and

nonfunctional elements, the scope of the claim must be construed in order to

identify the non-functional aspects of the design as shown in the patent."

Bernhardt, L.L.C. v. Collezione Euwpa USA, Inc., 386 F.3d 1371, 1383 (Fed. Cir.

2004); see also Richardson, 597 F.3d at 1293 (court should "factor[] out the

functional aspects").

Functional and ornamental elements of a design patent must be considered

together when assessing the scope of the claim. Apple v. Samsung, 2015 WL

2343543, *9.  The Federal Circuit has definitively rejected the notion that

functional elements should be identified and excluded from the patent before

assessing infringement. <u>Id</u>.  In <u>Apple</u>, Samsung argued that "the district court erred

in failing to exclude the functional aspects of the design patents either in a claim

construction or elsewhere in the infringement jury instructions."  <u>Id</u>.  Marklyn

made the same arguments in this case and the District Court adopted them when it

instructed the jury as follows:

> When considering the design patent, you should view certain features
> in the drawings in this way:
>
> The '780 patent claims the ornamental design for a flexible
> attachment strip having a plurality of forward facing LEDs, as shown
> in Figures 1-9 and described in the patent.  The broken lines in The
> '780 patent constitute unclaimed subject matter.
>
> **<u>Any purely functional feature should not be considered in
> determining infringement.  You may consider only the
> ornamental features of the claimed design</u>**.

(A1797)  As this Court rejected Samsung's arguments in <u>Apple</u>, this Court must

find that Instruction 11 was a misstatement of the law that prejudiced the verdict.

Just as it would have been inappropriate for the district court in <u>Apple</u> to identify

and exclude functional features, it was equally erroneous to instruct the jury here to

engage in the same analysis.  As the <u>Advanced Display</u> factors have been satisfied,

a new trial is warranted.

### 1.     Big Time Timely and Properly Objected to Instruction 11

Big Time objected to Instruction 11, both at trial and through its jury instruction brief.  (A1797; #98, Jury Instructions Brief, p11-12).  Big Time proposed Instruction 11, *sans* the newly engrafted language as a means for addressing the potential prejudice.  Big Time also argued that a <u>Markman</u> hearing on the functionality question, at a minimum, was required.  <u>Id</u>.  Finally, Big Time proposed additional instructions on the proper definition of functionality.    Big Time, therefore, properly preserved its right to request a new trial due to Instruction 11.

### 2.     The Court was Precluded from Deferring the Identification of Functional and Non-Functional Elements to the Jury

Instruction 11 failed as it delegated the District Court's responsibility to define the scope of the patent.  A district court must decide the scope of the patent as a matter of law.  <u>Markman</u>, 517 U.S. at 372 ("construction of a patent . . . is exclusively within the province of the court").  "When the parties raise an actual dispute regarding the proper scope of [patent] claims, the court, not the jury, must resolve that dispute." <u>O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.</u>, 521 F.3d 1351, 1360 (Fed. Cir. 2008).  Given the parties' dispute as to whether D'780 shows "both functional and non-functional elements," it was mandatory that "the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent."  <u>OddzOn Products, Inc. v. Just Toys,</u>

Inc., 122 F.3d 1396, 1405 (Fed. Cir. 1997); see also Richardson, 597 F.3d at 1293 (claim construction is necessary if a design contains "'purely functional' elements"). The Court abdicated its duty to resolve the parties' claim construction dispute, and improperly delegated this legal issue to the jury.

For a design patent, the court should guide the trier of fact by addressing a number of issues that bear on claim scope, including (1) describing the effect of representations made in the prosecution history, (2) describing "the role of particular conventions in design patent drafting, such as the role of broken lines," and (3) distinguishing between the ornamental and functional features of the claimed design. Egyptian Goddess, 543 F.3d at 680. In OddzOn, this Court held that "[w]here a design contains both functional and nonfunctional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." 122 F.3d at 1405. When OddzOn held that the claims "must be construed to identify the nonfunctional aspects of the design," 122 F.3d at 1405, it plainly meant that the Court must construe the claims and instruct the jury on the nonfunctional aspects of the design, for "construction of patent claims, which define the scope of the patentee's rights under the patent, is a matter of law exclusively for the court." Markman v. Westview Instr., Inc., 52 F.3d 967, 970-71 (Fed. Cir. 1995).

In support of its decision to instruct the jury to identify functional elements, the District Court cited to a single district court case that directed the jury to perform the task of construing the patented design to determine which features are functional.  (A0003) This reference is directly at odds with Apple.

Additionally, the District Court was incorrect in concluding that Egyptian Goddess overruled OddzOn, or permitted deference to the jury on the scope of the claimed design patent.  This Court has not authorized a court to defer claim construction to the jury on the question of construing the claims to distinguish between the functional and ornamental features of the design. Egyptian Goddess, 543 F.3d at 679-80. More particularly, the Court held that, "[a]part from attempting to provide a verbal description of the design, a trial court can usefully guide the finder of fact by addressing a number of other issues that bear on the scope of the claim." Id. at 680. This Court erased any doubt on this subject in Apple, supra.

Counsel for Marklyn agreed.  During the Markman hearing, Marklyn argued that functionality is a matter of law that must be addressed by the Court through claim construction:

> Let me just say, lastly, that in the Egyptian Goddess case, it was clearly said without any equivocation that the Court is to, as part of the claim construction, make a determination with respect to functionality.  I'm reading on page 680.  It says: A trial court can usefully guide the factor – the finder of fact by addressing a number of issues – and so on – assessing and describing the effect of any

44

representations that may have been made during the prosecution history, distinguishing between those features of the claim design that are ornamental and those that are purely functional. Where the design contains both functional and nonfunctional elements, the scope of the claim must be construed in order to identify the nonfunctional aspects of the design as shown on the patent.

The <u>Richardson</u> case basically was a challenge to that proposition. And it said clearly that it was part of the claim construction process, and as this Court knows, claim construction is for the Court.

(A515) Instruction 11 was a misstatement of the law in that it improperly delegated the question of claim scope to the jury, and as it instructed the jury to improperly ignore the functional elements in considering infringement and anticipation.

### 3.    Failure to instruct the jury on functionality necessarily created confusion.

The jurors were ill equipped to address functionality as defined by this Court. The definition of function under design patent jurisprudence is neither intuitive nor within the common knowledge of the average juror. Functionality is a prerequisite design patentability. <u>Hupp v. Siroflex of America, Inc.</u>, 122 F.3d 1456, 1460 (Fed.Cir. 1997) ("the fact that the article of manufacture serves a function is a prerequisite of design patentability, not a defeat thereof.") The utility of the various elements that comprise the design is not the relevant inquiry with respect to a design patent. <u>LA Gear Inc v. Thom McAn Shoe Company</u>, 988 F.2d 1117, 1123 (Fed.Cir. 1993). The jury was provided absolutely no guidance from

45

the District Court on how to go about assessing whether certain elements were

dictated by their functional purpose as defined in <u>Richardson</u>, 597 F.3d at 1294.

Namely, the jury was not instructed that design patents inherently cover products

that have useful function.

Rather, the jury was left to speculate on the concept of functionality in a

vacuum.  It was instructed that it should ignore all functional elements, regardless

if those elements are driven by function.  The jury was not instructed on how to

consider design alternatives in determining if a particular feature is driven by

function.  As a result, the jury reached an inconsistent verdict on the basis that the

Head 'N' Grill Litz infringed because it was not marketed for a particular function,

while the LEDLitz did not infringe because Marklyn happened to market a

particular functional benefit.

The impact on the jury's consideration of anticipation was more insidious.

Marklyn argued during closing that if the alleged functional elements were

excluded, there was nothing left to D'780.  If D'780 discloses nothing, it is

anticipated by everything.  This argument is fundamentally flawed and fails to take

into account that the proposed functional features are not driven by function.

(A0127; 0276-77)  Further, Marklyn acknowledged that its infringing products

looked different from JOM, was manufactured differently, with vastly different

costs of production.  Marklyn's witnesses simply failed to present any evidence

that the ordinary observer would consider JOM a single reference disclosing all of the elements of D'780, as claimed.  The actual evidence from Marklyn focused on the existence of similar functions, namely flexibility and sidewise illumination. Given Instruction 11, there is no real surprise that the jury latched on to these similar functions in finding anticipation.  This was simply an error created by a faulty instruction.

### 4.    Instruction 11 prejudiced the jury's determination of infringement.

Marklyn did not present a non-infringement case at trial.  None of Marklyn's witnesses testified that Marklyn's accused products do not infringe D'780.  On the other hand, Cheng testified that each category of accused product would appear visually the same as D'780 design to an ordinary observer.  Such testimony was aided by discussion and presentation to the jury of Exhibits 102, 103 and 104, which clearly show how the accused products look the same as each relevant view shown in the Figures of D'780.  The evidence was entirely one sided in establishing that an ordinary observer would be deceived into purchasing Marklyn's products, thinking them to be the patented design.  While Marklyn's counsel attempted to conceal the evidentiary void by asserting non-infringement *arguments* during closing statements, such is not evidence and cannot supply a basis for decision.  Thus, no reasonable juror could have found that Plaintiffs failed

to meet their burden of proof (a preponderance of the evidence) regarding infringement on all of Marklyn's accused products.

The inconsistent verdict verifies that Instruction 11 prejudiced the result. The jury found that the Head 'N' Grill Litz infringe, while the LEDLitz and Motion LED do not. All such products have substantially the same visual appearance. The only explanation for the jury's inconsistent verdict is that they were confused by the erroneous Instruction 11, which engrafted an improper and confusing advisement for the jury to disregard "functional features." In particular, during the trial, Plaintiffs' counsel pointed out during examination of both Plaintiffs' and Marklyn's witnesses that the Head 'N' Grill Litz product packaging contained a disclaimer that the product was not for use while a vehicle was in motion. (A1158-59) Marklyn repeatedly touted its accused products as "daytime running lights", encouraging the jury to focus on light emission even though it is disclaimed in D'780. (A1506-08) The jury likely believed that the Head 'N' Grill Litz product was nonfunctional as a "running light," whereas the LEDLitz and Motion LED (which did not contain similar disclaimers on their packaging) did so function. The jury then likely concluded, in error, that the LEDLitz and Motion LED did not infringe.

In fact, Marklyn failed to prove that any "feature" of D'780 was "functional" and, consequently, should be ignored in judging infringement. Marklyn contended

48

that two features were functional—the "forward facing" orientation of the LEDs and the "edge mounting" of the LEDs in relation to the flexible attachment strip. To prove such elements were "functional," a design patent term of art, Marklyn was required to adduce clear and convincing evidence that the element was "dictated by" its utilitarian purpose, i.e., that the design was the only way to achieve the functionality at issue. <u>L.A. Gear, Inc.</u>, 988 F.2d at 1123 (Fed. Cir. 1993); <u>Richardson,</u> 597 F.3d at 1294 (applying the "dictated by" standard to the question of whether particular elements were "driven purely by utility"). When, as was proven at trial in this case, there are alternate designs available, the "functionality" standard generally is not met. <u>E.g.</u>, <u>L.A. Gear</u>, 988 F.2d at 1123.

The evidence at trial demonstrated that alternative designs were available to serve the same utilitarian purpose as Marklyn alleged to be served by the "forward facing" and "edge mounting" design elements. Indeed, Kiss admitted to a number of available design choices that would achieve the same result. (A1126) For example, the 3A product and the superbrightleds.com product both revealed alternate designs for the same article at issue in D'780. (A1050-51; 1063-64; 1084)



(A627)  These alternate designs, featured side emitting LEDs that were mounted in the center of the flexible attachment strip rather than near the edge of the strip. Oznium offered an alternative side emitting LED style that accomplished the goal of sidewise admission of light:



(A0641) Kiss and Cheng testified these products presented viable design alternatives to that shown in D'780.  Id. Kiss also testified that one could alter the brightness of the light emitted—the claimed function of both the "forward facing" and "edge mounting" features identified by Marklyn—by specifying a higher output or higher powered LED.  (A1697)  The District Court agreed.  (A0125-26; 0276-77)

Because Marklyn did not meet its burden to prove that any feature of D'780 was functional, the District Court erred in instructing the jury that they could ignore "purely functional" features of D'780 when deciding infringement. A proper instruction would have omitted any reference to "functional features," and a reasonable jury therefore would have found infringement by all accused products. To the extent that the jury based its verdict of non-infringement as to the LEDLitz and Motion LED on claimed "functional features," such verdict was not supported by substantial evidence and must result in a new trial. Moreover, regardless of the rationale behind the verdict, the jury's finding of infringement as to the Head 'N' Grill Litz requires that judgment of infringement as to all accused products be entered. All record evidence at trial established that these products shared the same visual appearance, and that all infringe D'780.

5.      **Instruction 11 prejudiced the Jury's Verdict of Anticipation as there was not Legally Sufficient Evidentiary Basis Supported the Anticipation Verdict.**

a.      **The Standard of Anticipation of a Design Patent.**

In order to find D'780 anticipated, the jury was required to find that Marklyn introduced ***clear and convincing*** evidence that a single prior art reference disclosed the same design claimed in D'780. 35 U.S.C. §§ 102(a)-(b); <u>Cheese Sys., Inc. v. Tetra Pak Cheese & Power Sys., Inc.</u>, 725 F.3d 1341, 1351 (Fed. Cir. 2013) ("Anticipation requires clear and convincing proof that a single prior art

reference 'not only disclose[s] all of the elements of the claim within the four corners of the document, but . . . also disclose[s] those elements arranged as in the claim.'") (quoting <u>Net MoneyIN, Inc. v. Verisign, Inc.</u>, 545 F.3d 1359, 1369 (Fed. Cir. 2008)).  The Federal Circuit repeatedly has instructed that an anticipatory reference must not only contain all elements of the challenged claim, but must disclose all such elements arranged or combined precisely as in the claim.  "[T]he 'arranged as in the claim' requirement applies to all claims and refers to the need for an anticipatory reference to show all of the limitations of the claims arranged or combined in the same way as recited in the claims, not merely in a particular order."  <u>Net MoneyIN, Inc. v. Verisign, Inc.</u>, 545 F.3d 1359, 1370 (Fed. Cir. 2008).

"As with a utility patent, design patent anticipation requires a showing that a single prior art reference is 'identical in all material respects' to the claimed invention."  <u>Door-Master Corp. v. Yorktowne, Inc.</u>, 256 F.3d 1308, 1312 (Fed. Cir. 2001) (quoting <u>Hupp v. Siroflex of Am., Inc.</u>, 122 F.3d 1456, 1461 (Fed. Cir. 1997)).  Thus, for a prior art reference to anticipate a design patent, the single prior art reference must have the ***same visual appearance*** as shown in the claim of the patent-in-suit.  <u>Id.</u>; <u>see also Hupp</u>, 122 F.3d at 1461 (reversing jury verdict of anticipation because prior art had a different visual appearance than the design patent at issue).

To conduct the anticipation test, the jury was required to compare the overall visual appearance of the prior art reference to the overall visual appearance of D'780.  Cf. Crocs, Inc. v. Int'l Trade Comm'n, 598 F.3d 1294, 1304-1306 (describing proper side-by-side comparison of all views of the two designs for purposes of infringement).  The visual appearance of the prior art reference is determined by considering what the reference disclosed to one of ordinary skill in the art.  See Retractable Techs., Inc. v. Becton, Dickinson & Co., 653 F.3d 1296, 1309 (Fed. Cir. 2011) ("For a prior art reference to anticipate a patent claim, the reference, *as read by one of ordinary skill in the art*, must disclose each claim limitation.") (emphasis added).  It is impermissible and legally erroneous to reduce the comparison to a mere checklist of design elements or features.  Rather, "every aspect of the design contributes to the overall appearance."  Colida v. Sony Corp., 70 F.3d 130, 1995 WL 681478, *3 (Fed. Cir. Nov. 16, 1995).  If a prior art reference "merely suggests the components of the [] patent[ed] design but not its overall appearance, the design is not anticipated under section 102."  Id.; see also In re Balmer, 276 F.2d 405, 406 (C.C.P.A. 1960) (same).  A prior art disclosure that "almost" meets that standard does not "anticipate."  Jamesbury, 756 F.2d at 1560.

The way in which the elements are arranged or combined in the claim must itself be disclosed, either expressly or inherently, in an anticipatory reference.

Therasence, Inc. v. Becton, Dickinson and Co., 593 F.3d 1325, 1332 (Fed. Cir. 2010). The requirement that the prior art elements themselves be "arranged as in the claim" means that claims cannot be "treated ... as mere catalogs of separate parts, in disregard of the part-to-part relationships set forth in the claims and that give the claims their meaning." Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co., 730 F.2d 1452, 1459 (Fed.Cir. 1984). "[U]nless a reference discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations arranged or combined in the same way as recited in the claim, it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102." Net MoneyIN, 545 F.3d at 1371. In Therasence, this Court emphasized the requirement that the anticipatory reference must contain all of the limitations "***arranged or combined in the same way as recited in the claim.***" Therasence, 593 F.3d at 1332.

### b.    JOM Does Not Anticipate.

The evidence adduced at trial conclusively established that JOM uses a fundamentally different design than the one shown in D'780. On one hand, D'780 features a novel design for a flexible attachment strip with a plurality of forward facing (or "side emitting") LEDs. The testimony regarding D'780 established that the attachment strip is an integral part of the design. Indeed, D'780 claims such attachment strip as part of its design by illustrating the same in solid lines. On the

other hand, the design of the JOM product shown and claimed in the utility model is vastly different.

Unlike D'780, JOM does not use an a flexible attachment strip, thereby creating an entirely different look. Instead, JOM intentionally embraces an entirely different approach to powering the LEDs for purposes of creating maximal flexibility. JOM specifically points out this feature: "Typically SMD components are directly arranged on the surface of a circuit board and soldered to the contact surfaces. . . . In the preferred design examples [of the JOM utility model], the SMD light diodes are contacted through flexible connection wires in contrast to standard usage[.]" According to the utility model, "[t]he conductors **24, 26** are stranded wires each with 12 wires. The carrier **22** in this preferred design example consists of a transparent, flexible and therefore relatively soft PVC material in which the two conductors **24, 26** are cast. The carrier[] **22** and the conductors **24, 26** form a two-wire line, which stretches out in a longitudinal direction[.]"

Phillips testified on cross-examination that the JOM product has "cables" or wires running through a clear flexible "lamellar" PVC material to wire the LEDs together. He specifically distinguished the construction of the Marklyn accused products from that of the JOM product because, like D'780, the accused products use an flexible attachment strip with the LEDs, rather than wires embedded in a transparent PVC material. Kiss and Cheng agreed. Kiss explained that rather than

using an attachment strip, JOM disclosed LEDs that must be positioned within the lamellar carrier, such that the LEDs were essentially free-floating within the PVC and not attached to a strip.  Accordingly, there was no evidence whatsoever to demonstrate that JOM disclosed one of the elements of D'780 design—a flat, flexible attachment strip to which the LEDs are mounted.  This major and fundamental distinction between JOM and the claimed design means that there was no evidence of anticipation, let alone clear and convincing evidence, thus requiring a reasonable jury to reject Marklyn's defense.

All witnesses agreed that JOM includes an opaque casing surrounding the PVC light carrier, such that the LEDs used in the product are invisible to an observer except for the light emitting face (i.e., a single transparent side of the LED is visible).  Phillips and Kiss agreed that the JOM product is encased by a light impermeable casing, which prevents the observer from seeing the LEDs or anything covered by the casing.

When asked to contrast the visual appearance of JOM with the appearance of the accused product (which infringes D'780 design), Marklyn's President testified that the two designs were quite a bit different.  Similarly, Kiss distinguished the appearance of JOM from the accused products (where the LEDs attached to an attachment strip are visible) because JOM has a black casing surrounding the LEDs except on the light emitting side.

Kiss was the sole expert offered by Marklyn. Kiss did not testify that the ordinary observer would conclude that JOM disclosed all of the elements of D'780. In fact, no witness testified that the ordinary observer would conclude that each ornamental design disclosed in D'780 was disclosed by JOM. Schumer v. Lab. Computer Sys., Inc., 308 F.3d 1304, 1315 (Fed. Cir. 2002)( "The testimony is insufficient if it is merely conclusory.") Mr. Cheng testified that the ordinary observer would not conclude that JOM disclosed all of the elements of D'780 in a single reference as required by this Court's precedent. (A1064-67; 1080-1; 1084; 1122) Cheng testified that JOM disclosed to the ordinary observer a flexible LED product encased by a light impermeable coating, which differs drastically in appearance from the design of D'780 and the accused products. Thus, the evidence was uniform in establishing that JOM was fundamentally different in appearance from the design shown in D'780.

Marklyn's only attempt to vary this conclusion was by improper argument that the jury could discern from the JOM utility model an undisclosed and unclaimed design for a product without the light impermeable casing. This improper argument cannot support the jury's verdict of anticipation for at least two reasons. First, the argument is contrary to the disclosure of the utility model. Second, even if the impermeable casing could be disregarded by the jury (which it

could not), what remains would still appear fundamentally different than D'780 design.

Each of Figures 1, 2 and 3 are illustrations of the same preferred embodiment that was claimed by JOM. Figure 1 depicts the "preferred design example of the new luminous row . . . in its entirety" while Figures 2 and 3 show the product "without the light impermeable casing" from side and top views. Figures 2 and 3 simply remove the light impermeable casing for purposes of illustrating the connection of the LEDs to the conductor wires, in a "reveal" or "cut-away" type of view. But the claimed design disclosed in the utility model requires the presence of a light impermeable casing place on top of the LEDs. Claim 1 requires "a flexible [sic], light impermeable casing **(48)** which covers the wide side **(30, 32)** and exposes the smaller side **(34)** at least in the area of the light element **(40)**). Claims 2-14 depend on claim 1. The specification makes clear that the light impermeable casing is a fundamental part of the invention disclosed: "In accordance with an aspect of ***the invention***, this is solved through a luminous row of the previously mentioned type . . . ***by which a flexible, light impermeable casing is arranged around the carrier, whereby this casing covers the wide side*** and the small side is at least left open in the area of the light element."

What a prior art reference discloses is viewed from the standpoint of one of skill in the art.[2] <u>Retractable Techs.</u>, 653 F.3d at 1309.  Both Cheng and Kiss, the only expert witnesses in this case, testified that the JOM utility model discloses a product with a light impermeable casing surrounding at least the "wide sides", i.e., top and bottom, of the LEDs.  Thus, the only visual appearance of the JOM utility model reference to be considered by the jury was required to include the light impermeable casing **(48)**, as required by the disclosure of the utility model and depicted (by dark shading) in its illustration of the entire product:



Based on the testimony and the JOM utility model, no reasonable juror could find that JOM had the same overall appearance as D'780.

Even if the casing is removed, JOM maintains a very different appearance from D'780.  The JOM utility model is clear in explaining that (1) there is no flexible attachment strip shown in Fig. 3 but rather a transparent PVC carrier in which wires and LEDs are cast, and (2) the transparent carrier is a three-

---

[2] The question of what the prior reference discloses—i.e., what visual appearance is disclosed by the reference to one of skill in the art—must be established before conducting the visual comparison.

dimensional rectangle shape, not a flat strip with LEDs mounted on top of it as shown in D'780. The lack of an attachment strip precludes anticipation. The three-dimensional nature of the carrier in which LEDs and wires are embedded is an additional, significant difference from the design of D'780. Specifically describing Figs. 2 and 3, the JOM utility model explains: "The carrier **22** has an upper wide[] side **30** (upper side) and a lower wide side **32** (under side) and two smaller sides **34, 36**. *In the cross section, the carrier 22 is mostly rectangular*." Figure 3 thus clearly depicts a three-dimensional, transparent carrier that is rectangular in cross section. Thus, even the cut-away views of Fig. 2 and 3 of the JOM utility model can only be interpreted as showing a three-dimensional, transparent PVC carrier within which LEDs are <u>embedded</u>, rather than mounted upon. Such is not even roughly similar to the design claimed in D'780 and could not provide any basis to find anticipation.

> **c.    Instruction 11 prejudiced the jury's consideration of anticipation by permitting it to exclude allegedly functional elements D'780**

Instruction 11 invited the jury to ignore all of D'780 when assessing its claimed scope. If the jury accepted Marklyn's invitation during closing to ignore the forward facing LEDs and the near edge mount feature, the jury may have concluded that D'780 patent was anticipated by JOM as both had a generally rectangular shape. Put differently, if the jury was permitted to ignore purely

functional features for purposes of assessing whether there was a prior art reference that disclosed all of the elements of the remaining claim, the jury likely concluded that JOM anticipated D'780. This court has never endorsed such an analysis.

As outlined above, JOM fails to disclose the flexible attachment strip or LEDs mounted on top, and near the edge of the attachment strip. After all, JOM does not disclose an attachment strip as claimed in D'780. Further, JOM requires a casing that obscures the ordinary observer's view of the LEDs in all but one view – a feature that is expressly rejected by D'780. If D'780 was viewed as whole, as required by Apple v. Samsung, supra *9-10, the jury would not have had clear and convincing evidence of anticipation.

> ### d.    Marklyn failed to present any evidence that the Lee reference anticipated D'780.

Marklyn may assert that the Lee application could have been considered by the jury. (A0771-80) The only testimony regarding the visual appearance of the product disclosed by the Lee reference came from Big Time's expert Cheng. Marklyn proffered no testimony whatsoever on this reference. Thus, the only evidence before the jury regarding purported anticipation of D'780 by the Lee reference was Cheng's testimony.

Cheng's uncontroverted testimony established that the Lee reference would disclose to the ordinary observer a cube-shaped product with LEDs sandwiched

between an opaque casing (31) filled with PVC (35) and LEDs (11) that creates a

center mounted, upward-facing LED product.  (A1059-1064)



Cheng walked the jury through the illustrations contained in the Lee reference and

explained that he was personally familiar with the type of products embodying the

disclosure.  (A1060) Figures 1 through 3 of the application depict what Cheng

described to the jury—a product having a square cross section with opaque casing

on 3 of four sides.  (A1061) He concluded by stating that the ordinary observer

would not confuse the Lee reference with the D'780 patent due to their many

differences.  (A1064).

Marklyn presented no evidence at trial to rebut this testimony, only

argument of counsel during closing.  Marklyn's argument through counsel is not

evidence that could support a jury verdict, and cannot overcome the testimony of

Cheng that one of skill in the art would read the Lee reference as disclosing a

product with a very different overall visual appearance than the '780  patent.  Such

argument is also clearly controverted by the Figures in the reference, which show a product with a square cross section encased on three sides by an opaque covering. Marklyn's attempt to take a component element of the Lee reference is also contrary to the law of design patent anticipation.  In applying the ordinary observer test - whether for infringement or validity purposes - the comparison between the patented design and the accused infringing product must include all ornamental features visible at any time during normal use of the product. Contessa Food Products v. Conagra, Inc, 282 F.3d 1370, 1380-81 (Fed.Cir. 2002). "Normal use" of a product begins " 'after completion of manufacture or assembly' " and ends " 'with the ultimate destruction, loss, or disappearance of the article.' " Id. at 1380 (quoting In re Webb, 916 F.2d 1553, 1557-58 (Fed. Cir. 1990)). Accordingly, "normal use" of a product includes the useful life of the product at any time subsequent to manufacture, including its display at point of sale and its subsequent use by the purchaser, until such time as the product is disposed of.

Based on the trial evidence, no reasonable juror could find that Marklyn proved that it was highly probable and free from any substantial doubt that the product disclosed by the Lee reference had the same visual appearance as D'780. To the extent the jury based its anticipation verdict on this reference, its verdict must be reversed.

## IV.    A NEW TRIAL IS WARRANTED AS A RESULT OF ERRONEOUS INSTRUCTION 11.

Instruction 11 was improperly submitted for several reasons:  (1) whether D'780 depicts "functional" features is a claim construction issue that the Court was required to decide; (2) the evidence submitted during trial proved that no features of D'780 that were "purely functional"; and (3) even if delegating this claim construction issue to the jury was proper (it was not), the instruction wholly failed to apprise the jury of the operative legal standard to decide whether a feature is "purely functional" or "ornamental."

Moreover, Instruction 11 was erroneous and requires a new trial because it was substantively unsupported by the evidence.  The evidence was overwhelming and unrefuted that there are design alternatives to the design shown in D'780 which produce a product having the same utilitarian purpose as the article described in the patent.  Marklyn simply failed to prove that any feature was dictated purely by function.  Hence, the jury never should have been instructed on this topic, and such error requires a new trial.

Instruction No. 11 also is incorrect and requires a new trial because it failed to apprise the jury of the governing legal standard to determine what constitutes a "purely functional feature."  Although it was error to submit this issue as an open question to the jury (as discussed above), even if it was not, the jury could not understand how to undertake the task before them because they were not instructed

how to parse "functional" features from "ornamental" features. Any such instruction must have included a description of the "dictated by" standard set forth in L.A. Gear and repeatedly affirmed in design patent cases by the Federal Circuit.

Finally, permitting the jury to identify functional features prejudiced the jury's view of infringement or anticipation. Head 'N' Grill Litz and LEDLitz are the same product, yet one infringes and one does not. This inconsistent verdict has its roots in Instruction 11 and the advertised functional benefits of each branded product, not their actual appearance. On anticipation, Marklyn argued that the jury should exclude the forward facing LEDs and the edge mounted feature, leaving D'780 with little left. Not only was this approach legally inappropriate, it allowed the jury to use JOM to find anticipation. After all, if D'780 discloses nothing, so the argument goes, everything would anticipate. In view of the many visual differences between JOM and D'780, the jury's finding of anticipation must be premised upon the similarities in flexibility and sideways illumination, both functional features. As there is no evidence that the ordinary observer would find that JOM disclosed all of the elements of D'780, as claimed and arranged, a new trial on anticipation is warranted due to the prejudicial impact of Instruction 11.

A verdict premised upon functionality is fundamentally flawed, in the end, as Marklyn admitted that D'780 is not dictated by function. Prior to trial, Marklyn "conceded that the expert report does not support the affirmative defense of

functionality, which requires proof that the design of the '780 patent as a whole was dictated by function." (A0275, fn. 10)

## V.    CONCLUSION

Big Time respectfully requests the this Court remand for a new trial on infringement and anticipation.

Respectfully submitted,

/s/ Aaron P. Bradford
AARON P. BRADFORD
HOLLAND & KNIGHT LLP
633 17th Street, Suite 2300
Denver, Colorado 80202
(303) 974-6600

Attorneys for Plaintiffs-Appellants

# ADDENDUM

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 11-cv-01765-REB

YAO-HUNG HUANG, and
BIG TIME AUTO PARTS MANUFACTURING, INC., a Taiwan corporation,

     Plaintiffs,

v.

MARKLYN GROUP, INC., d/b/a ALPENA, a Canadian corporation,

     Defendant.

---

**ORDER DENYING PLAINTIFF'S RENEWED MOTION
FOR JUDGMENT AS A MATTER OF LAW OR MOTION FOR A NEW TRIAL**

---

**Blackburn, J.**

     The matter before me is **Plaintiff's Renewed Motion for Judgment as a Matter of Law or Motion for a New Trial** [#128],[1] filed September 15, 2014.  Following a six-day trial, a jury returned a verdict in favor of defendants on plaintiffs' claim of infringement as well as on defendant's affirmative defense of invalidity by anticipation.  By this motion, plaintiffs renew their post-trial motion for judgment as a matter of law as to the defense of invalidity due to anticipation and move for a new trial on the basis of an allegedly improper jury instruction on plaintiffs' claim of infringement.  I deny the motion.

---

[1] "[#128]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF). I use this convention throughout this order.

0001

## I.  MOTION FOR NEW TRIAL

The standards governing a motion for new trial are rigorous, and a new trial is only warranted where, "having given full respect to the jury's findings and viewing the entire evidence, the trial judge is left with the definite and firm conviction that a mistake has been committed." *Hughes v. Regents of University of Colorado*, 967 F.Supp. 431, 437 (D. Colo. 1996) (internal citation omitted).  "Generally, courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or substantial justice has not been done." *Id*.  *See also McHargue v. Stokes Div. of Pennwalt Corp.*, 912 F.2d 394, 396 (10th Cir. 1990) ("In ruling on a motion for a new trial, the trial judge has broad discretion. . . . He may do so when he believes the verdict to be against the weight of the evidence or when prejudicial error has entered the record.").  When the motion is premised on allegedly improper jury instructions, the instructions must be viewed in their entirety, not as single instructions or parts of instructions.  *Hampton v. Dillard Dept. Stores, Inc.*, 247 F.3d 1091, 1112 (10th Cir. 2001), *cert. denied*, 122 S.Ct. 1071 (2002).

Plaintiff objects that Jury Instruction No. 11 was erroneous insofar as it included the following final paragraph:

> Any purely functional feature should not be considered in determining infringement.  You may consider only the ornamental feature of the claimed design.

Plaintiffs maintain that the issues of functionality and ornamentality of the claimed design were matters of patent scope and thus should have been determined by the court as part of claim construction and then any purely functional features expressly

0002

described for the jury within the context of the instruction.

There are at least two problems with this argument.  First, it is not at all clear to this court that these issues must be determined exclusively as a matter of claim construction.  As another district court has noted in parsing the Federal Circuit's opinion in *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008), *cert. denied*, 129 S.Ct. 1917 (2009):

> It is not entirely apparent . . . whether the Federal Circuit advocates resolving prosecution history and functionality issues through formal *Markman* claim construction, jury instructions, or some other means.  On the one hand, the court refers to "guid[ing] the finder of fact" in a manner "[a]part from attempting to provide a verbal description of the design," which suggests jury instructions may be the best avenue.  On the other hand, the court's parenthetical quotation from *OddzOn* [*Products, Inc. v. Just Toys, Inc.*, 122 F.3d 1396 (Fed. Cir. 1997)] suggests that these issues, or at least the question of functionality, may properly be addressed during claim construction.  One thing that does seem clear from *Egyptian Goddess* is that district courts have considerable discretion for resolving this type of question.

*Depaoli v. Daisy Mfg. Co., Inc*., 2009 WL 2145721 at *3 (D. Mass. July 14, 2009) (internal citation omitted).

Second, and even if claim construction were the proper mechanism for the resolution of these issues, plaintiffs did not raise this issue at a time or in a manner which gave the court adequate time to resolve the matter prior to trial.  In proffering their original proposed claim constructions, both parties indicated elements that they believed comprised the ornamental aspects of the design.  Noting that discovery had not yet commenced at that juncture, I declined to construe the claims at that level of specificity,

finding that it "would be unwise . . . on the current state of the record" to attempt a more detailed construction.  (*See Order Construing Disputed Patent Claims* at 5 [#42], filed October 11, 2012.)  Nevertheless, I expressly noted that further claim construction could be undertaken if necessary at some later point in the proceedings.  (*See id.* at 5-6.)

However, even after discovery was completed, neither party moved for further construction.  In particular, plaintiffs did not suggest that further construction was required to distill the functional from the ornamental aspects of the patented design until they filed their jury instruction brief, which was submitted barely three weeks before trial was set to commence.  (*See Plaintiffs' Jury Instruction Brief* at 11 [#98], filed July 11, 2014.)  Even then, plaintiffs neither moved to have such further construction undertaken nor otherwise proffered any concrete, practical proposal that would have allowed the court to make such a determination, either in the limited time remaining prior to trial or even in the exceedingly brief period of time between the close of the evidence and the submission of the case to the jury.

Given these facts, it appears to this court that plaintiffs have forfeited this argument.  "[F]orfeiture is the failure to make the timely assertion of a right[.]"  *United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993). *See also United States v. Rezendes*, – Fed. Appx –, 2015 WL 1475306 at *3 (10th Cir. Apr. 2, 2015).  Unlike waiver, which "is the intentional relinquishment or abandonment of a known right," *Olano*, 114 S.Ct. at 1777, "forfeiture is attributable to neglect," *United States v. Carrasco–Salazar*, 494 F.3d 1270, 1272 (10th Cir. 2007).  As such, a forfeited

0004

error is reviewable for plain error.  *United States v. Morrison*, 771 F.3d 687, 695 (10th

Cir. 2014).  To meet the plain error standard, plaintiffs must establish not only fact of

error that is plain but also that such error affected plaintiffs' substantial rights.    *United*

*States v. Cordery*, 656 F.3d 1103, 1105 (10th Cir. 2011).  Even if these factors are

satisfied, the court must exercise its discretion to correct the error only "if it seriously

affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

Although plaintiffs have failed to address these standards in their motion, the

court is willing to assume *arguendo* that the failure to more specifically instruct the jury

as to which elements of the design were functional and which were ornamental may

well have constituted plain error which affected plaintiffs' substantial rights.

Nevertheless, the fourth prong of the plain error standard would not be satisfied in this

case in any event:

> The fourth prong of the plain error test is discretionary.  If
> [plaintiffs] can show an error is plain and affects substantial
> rights, a court must exercise considered judgment in
> deciding whether the error must be corrected.  A court
> should do so where it seriously affected the fairness,
> integrity, or public reputation of the judicial proceedings.
> Although a showing (or presumption) of prejudice is
> necessary to meet this prong, it is not sufficient because not
> every prejudicial error threatens the fairness and integrity of
> the proceedings.  Rather, the fourth prong is an independent
> inquiry, more appropriately compared with a miscarriage of
> justice standard under which a claimed error should not be
> corrected, unless allowing it to stand would be particularly
> egregious.

*United States v. Turrietta*, 696 F.3d 972, 984 (10th Cir. 2012) (citations and internal

quotation marks omitted).  "[This] standard is formidable[.]"  *Cordery*, 656 F.3d at 1108

(citation and internal quotation marks omitted).  It is not met here because, even if the

5

jury's finding of non-infringement was based on erroneous instructions, its finding of

anticipation – which is the subject of plaintiffs' alternate motion for judgment as a matter

of law – was sufficient to support the verdict in defendant's favor.

## II.  MOTION FOR JUDGMENT AS A MATTER OF LAW

A renewed motion for judgment as a matter of law post-verdict is determined

under the same standards that govern resolution of a post-evidentiary motion for

judgment as a matter of law under Fed. R. Civ. P. 50(a).  The "standard for granting

summary judgment mirrors the standard for judgment as a matter law, such that 'the

inquiry under each is the same.'"  *Reeves v. Sanderson Plumbing Products, Inc*.,

530 U.S. 133, 150, 120 S.Ct. 1097, 2110, 147 L.Ed.2d 105 (2000) (quoting *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202

(1986)).  A party seeking relief under Rule 50(b) is entitled to judgment as a matter of

law if the evidence so overwhelmingly supports one position that no reasonable

inferences may be drawn from the evidence to sustain the position of the nonmovant.

*Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 812 (10th Cir. 2000).

"[A]lthough the court should review the record as a whole, it must disregard all evidence

favorable to the moving party that the jury is not required to believe."  *Reeves*, 120 S.Ct.

at 2110.  "[I]n reviewing the record, [the court] will not weigh evidence, judge witness

credibility, or challenge the factual conclusions of the jury."  *Hampton*, 247 F.3d at 1099

(internal quotation marks omitted).

> Thus, although the court should review the record as a
> whole, it must disregard all evidence favorable to the moving
> party that the jury is not required to believe.  That is, the
> court should give credence to the evidence favoring the

> nonmovant as well as that "evidence supporting the moving
> party that is uncontradicted and unimpeached, at least to the
> extent that the evidence comes from disinterested
> witnesses."

*Reeves*, 120 S.Ct. at 2110 (quoting 9A C. Wright & A. Miller, ***Federal Practice and***

***Procedure*** § 2529 at 300 (2nd ed. 1995)).  Thus, judgment as a matter of law must be

denied if there is any legally sufficient evidentiary basis for a claim.  ***Hampton***, 247 F.3d

at 1099.

Given these stringent standards, motions under this rule "should be cautiously

and sparingly granted."  ***Lucas v. Dover Corp.***, 857 F.2d 1397, 1400 (10th Cir. 1988)

(citations omitted).  This case presents no such exceptional circumstances.  Having

considered all the relevant evidence, both direct and circumstantial, and having applied

the foregoing principles and standards of analysis to the existing evidentiary record, I

conclude that plaintiffs are not entitled to judgment as a matter of law.  None of the

evidence is incredible as a matter of law, and there was a legally sufficient evidentiary

basis for a reasonable jury to find in favor of defendant on each essential element of its

affirmative defense of invalidity due to anticipation.

For these reasons, I find and conclude that plaintiffs' motion for judgment as a

matter of law must be denied.

**THEREFORE, IT IS ORDERED** that **Plaintiff's Renewed Motion for Judgment**

**as a Matter of Law or Motion for a New Trial** [#128], filed September 15, 2014, is

denied.

Dated April 8, 2015, at Denver, Colorado.

**BY THE COURT:**

Bob Blackburn

Robert E. Blackburn
United States District Judge

7

0007

## CERTIFICATE OF FILING AND SERVICE

I, Aaron P. Bradford, hereby certify pursuant to Fed. R. App. P. 25(d) that, on

August 21, 2015 the foregoing Brief for Plaintiffs-Appellants was filed through the

CM/ECF system and served electronically on the individual listed below:

The required copies will be forwarded to the court upon approval.

/s/ Aaron P. Bradford

AARON P. BRADFORD
HOLLAND & KNIGHT LLP

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

_x___ The brief contains _13,739_____ words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

_x___ The brief has been prepared in a proportionally spaced typeface using _MS Word 2002_ in a 14  point  Times New Roman font or

_____ The brief has been prepared in a monospaced typeface using _MS Word 2002_ in a ___ characters per inch_____ font.


/s/ Aaron P. Bradford
AARON P. BRADFORD
HOLLAND & KNIGHT LLP